Paul WALSH, et al., Plaintiffs,

v.

ERIE COUNTY DEPARTMENT OF
JOB AND FAMILY SERVICES,
et al., Defendants.

No. 3:01CV7588.

United States District Court,
N.D. Ohio,
Western Division.

Jan. 22, 2003.

Kurt D. Anderson, Fauver, Tattersall & Gallagher, Elyria, OH, for Plaintiffs.

Gary A. Lickfelt, Sandusky, OH, Joan C. Szuberla, Spengler Nathanson, Toledo, OH, Terry R. Griffith, Office of the Prosecuting Attorney, Sandusky, OH, Hilary S Taylor, Weston, Hurd, Fallon, Paisley & Howley, Gary A. Vick, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Defendants.

## AMENDED ORDER

CARR, District Judge.

This is a civil rights case arising from the search of the home of the plaintiffs, Paul and Linda Walsh, who bring individually and as parents on behalf of their six children, against caseworkers Nycola Darnold and Lana Brown and their employer, the Erie County, Ohio, Department of Job and Family Services (ECDJFS), the Erie County Board of Commissioners (the "Board"), the City of Vermilion, Ohio (the "City"), and three Vermilion police officers, Corporal Rick Riggs, Sergeant Jeffrey Chandler, and Chief of Police Robert A. Kish. Plaintiffs assert federal claims under 42 U.S.C. § 1983 and state constitutional and common-law tort claims. Jurisdiction arises under 28 U.S.C. §§ 1331 and 1367.

Pending are motions by all defendants for summary judgment. For the following reasons, summary judgment shall be: 1) granted in part and denied in part with regard to the caseworkers, ECDJFS, and the Board; 2) granted in part and denied in part with regard to Sergeant Chandler and Chief Kish; and 3) granted in favor of Corporal Rick Riggs and the City of Vermilion.

## BACKGROUND

On February 20, 2001, ECDJFS received an anonymous report of poor conditions at the plaintiffs' residence; namely, that the home was cluttered and overcrowded and the children were developmentally delayed and without proper medical or educational care. ECDJFS assigned defendant social worker Nycola Darnold to the case. After Darnold learned of the complaint, she telephoned Matthew Work, an inspector with the Erie County Board of Health, to coordinate a visit to the Walsh residence.

ECDJFS case workers are trained to assume that any report of adverse conditions is true, and thereon to begin an investigation. Regardless of whether the report contains specific information, caseworkers assume that there is an imminent danger of harm to children on the premises.

Section 2151.421(F)(1) of the Ohio Revised Code states: "the public children services agency shall investigate, within twenty-four hours, each report of known or suspected child abuse or child neglect . . . ." By telephoning Work and making an appointment for the next day, Darnold began an investigation into the Walsh home and the condition of the children.

Around 3:45 p.m. the next day, February 21, 2001, Darnold and codefendant caseworker Lana Brown met Work outside the Walsh home. They approached the house; as they did so, they observed two five gallon buckets of a drywall compound,

several boxes of clothes, and about 150 TTY devices (deaf telephones) located on the porch. In their opinion, the presence of these items confirmed the allegation in the anonymous report that the home was "cluttered."

When Mrs. Walsh answered the door, Darnold introduced herself and explained that ECDJFS had received an anonymous complaint that the children were living in unsafe conditions. Darnold told Mrs. Walsh that it was part of her job to enter the home and ensure the children's safety. According to Mrs. Walsh, Darnold stated that the caseworkers would be in trouble with their supervisors if they were not allowed inside the home to complete the investigation.

Mrs. Walsh refused to let the county workers into her home. She telephoned her husband, who was at work. Mrs. Walsh took a cordless telephone to the porch so Mr. Walsh could speak with Darnold. Mr. Walsh asked Darnold if the county workers had a search warrant.

According to Darnold, she explained to Mr. Walsh that she did not have a warrant but that she had an anonymous report and she needed to see if the children were safe in the home within a mandated time frame. According to Mr. Walsh, Darnold told him that if the plaintiffs refused access, Darnold would declare an emergency and forcibly remove the children from the home.

Mr. Walsh told Darnold that he was coming home. The county workers left to make other house visits.

Around 4:30 p.m., Darnold, Brown, and Work returned to the Walsh residence. According to the caseworkers, when Mr. Walsh arrived, he spoke to an attorney, who was affiliated with the Home School Legal Defense Association, a national or-ganization providing advice and counsel to families who, like the plaintiffs, elect to home school their children. After speaking with the lawyer, Mr. Walsh told Darnold and Brown that he was not going to let them in the house without a search warrant. Darnold then called her administrator at ECDJFS to tell him that Mr. Walsh was demanding a search warrant. Darnold then called the Vermilion Police.

According to Mr. Walsh, when he again asked for a search warrant, Darnold insisted that she did not need a warrant and that she could remove the children if the plaintiffs refused to cooperate. Mr. Walsh also claims Darnold warned Mr. Walsh that he would face citations for any conditions found in the home.

At some point, the plaintiffs agreed to allow Darnold to observe the children on the enclosed porch. According to Darnold, observing the children on the porch in their winter coats did not enable her to assess whether they were developmentally delayed. Thus, she asserted that she still needed access to the home to complete her investigation.[1]

Defendant Vermilion Police Sergeant Chandler arrived while the caseworkers were inspecting the children. A short while later, defendant Vermilion Police Corporal Rick Riggs arrived.

While Darnold was inspecting the children, Sgt. Chandler told Mrs. Walsh that it was Darnold's job to ensure the children were safe and that the inspection of the home did not have to be a "big deal" and was "routine."

According to Mr. Walsh, Sgt. Chandler told him: "If you make us go through the hassle of getting a warrant, rest assured we will cite you for anything we find in the

---

1. The record does not indicate on what basis Darnold could, during the course of an interview, determine that one or more of the plain-tiffs' six children was developmentally delayed. Nor does it indicate the basis for that or any other aspect of the anonymous tip.

home." Sgt. Chandler also allegedly warned that if the plaintiffs did not allow the caseworkers into the home, Mr. Walsh could be arrested for obstruction of official business.

In light of the plaintiffs' continuing refusal to permit Darnold and Brown to inspect the home, Darnold again called her supervisor. He advised Darnold to call an Erie County assistant prosecutor, who, in turn, advised Darnold to obtain a search warrant. Meanwhile, Mr. Walsh also spoke again to his attorney.

Between 5:30 and 6:00 p.m., the defendants left the Walsh residence to try to obtain a search warrant. The parties dispute whether Mr. Walsh knew the defendants were leaving to obtain a search warrant (and thus, planning to return). Mr. Walsh asserts that he did not know the defendants planned on coming back to his home with a search warrant.

While preparing an affidavit for a search warrant at the Vermilion Police Department, Chief Kish, gave Brown a radio, told her to return to the Walsh residence, and to let him know if the plaintiffs attempted to leave. Chief Kish then contacted Judge Wakefield of the Vermilion Municipal Court to obtain an "administrative" warrant.

Driving Darnold's automobile, Brown returned to the Walsh residence and parked on the road in front of the house. She observed the children and parents entering a van; according to Mr. Walsh, the family was leaving to go to a function at their church.

Brown radioed Chief Kish to notify him that it appeared that the family was about to leave the premises. She claims that the car was not blocking the plaintiffs' driveway. Mr. Walsh disputes this assertion, and testified that the family could not depart because Darnold's car was in front of their driveway. He claims Brown told him: "If you want to leave, you will have

to ram me!" Brown denies having made this statement. She testified that she told Mr. Walsh that she was not trying to block him or prevent him from leaving. She told Mr. Walsh that the police were on their way and they were obtaining a search warrant.

The police received Brown's call while they were still preparing an affidavit for a search warrant. After the call, Darnold, Work, Sgt. Chandler, and Chief Kish returned to the Walsh home.

According to Mr. Walsh, when Sgt. Chandler arrived, he yelled: "This has gone on long enough! I am taking you into custody for obstruction of official business." Sgt. Chandler then placed Mr. Walsh spread-eagle on Darnold's car and frisked him.

When Mr. Walsh stated that he did not want to be arrested, Chief Kish, according to Mr. Walsh, stated, "Listen, if you just let them into the house, I am sure we can work that out."

Mr. Walsh understood Chief Kish's statement to mean that he would not be arrested if he allowed the caseworkers to conduct an inspection of the home. Walsh claims that he was afraid that if he were arrested, his wife would be helpless to confront the police. If she refused the search, then she would also be arrested and the children could be removed from the plaintiffs' custody. Mr. Walsh claims that because he had no other choice, he allowed the caseworkers into the house.

Chief Kish acknowledges that charges of obstructing official business were probably mentioned during his conversation with Mr. Walsh. Chief Kish testified: "All I knew is I talked to him and I explained that there's steps that could be taken and I said, 'All we want to do is get in the house,' and we had a conversation. I don't

remember all the words, all the details." (Kish Dep. at 55).

Darnold and Brown claim they did not hear the conversation between Chief Kish and Walsh, but it was their understanding that Mr. Walsh consented to their entry of the home.

Mr. Walsh, Darnold, Brown, Work, and Sgt. Chandler then entered the residence. Believing Mr. Walsh when he said, in response to whether he had any firearms, that there were no weapons in the home, Sgt. Chandler remained in the living room during the county employees' inspection.

Darnold's inspection encompassed cupboards, drawers, the refrigerator, and locked cabinets, which Mr. Walsh opened at her request. Darnold determined that there were enough beds for the children, there was an adequate food supply, and that knives and chemicals were stored out of the children's reach. She testified, however, that the house was so cluttered, they had to walk single file.

Work testified that some boxes and paper were stacked on top of an electric heater, some electrical boxes had exposed wiring, and a water heater vent pipe was too close to insulation.

Brown took photographs in the house, though Mr. Walsh claims he had asked her not to.

At the end of the inspection, Darnold concluded that there were no significant hazards. She told Mr. Walsh that she would send a list of suggestions for eliminating the clutter. Mr. Walsh was not taken into custody. The defendants took no further action against them.

In November, 2001, the plaintiffs brought this suit, which asserts six causes of action.

Count One, brought under § 1983 and the Ohio Constitution, claims that defendants deprived plaintiffs of their rights under the United States and Ohio Constitutions to be secure in their persons and home against unreasonable searches and seizures and their liberty interests in the integrity and autonomy of their family.

Count Two, also brought under § 1983, alleges ECDJFS, the Board, the City, and Chief Kish failed to provide proper training for the other individual defendants and to promulgate and implement policies designed to protect the civil rights of families subject to allegations of child abuse or neglect.

Count Three, likewise brought under § 1983, alleges that Darnold, Brown, Corporal Riggs, Sgt. Chandler, and Chief Kish acted pursuant to official policies when they: 1) conducted the warrantless search of plaintiffs' home; 2) threatened to arrest Mr. Walsh and remove the children if the plaintiffs did not consent to that search; and 3) blocked the Walsh vehicle and prevented their departure. According to the complaint, these policies are promulgated by ECDJFS, the Board, and the City and are deliberately indifferent to the constitutional rights of families subject to allegations of child abuse or neglect.

Counts Four, Five, Six, and Seven assert state law claims of false arrest, assault, battery, and intentional infliction of emotional distress.

Count Eight asserts a federal and state conspiracy charge.

Darnold, Brown, ECDJFS, and the Board ("County Defendants") and Sgt. Chandler, Corporal Riggs, Chief Kish, and the City ("City Defendants") move this court for summary judgment on all counts.

### STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## DISCUSSION

### § 1983 Claims

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The individual defendants, in their capacity as ECDJFS caseworkers and police officers of the City of Vermilion, acted under color of state law. Therefore, the question is whether their actions violated the plaintiffs's Fourth and Fourteenth Amendment rights.

### A. Fourth Amendment Claims

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Supreme Court has rejected the proposition that the Fourth Amendment offers no protection against government entry into a home unless the entry is to conduct a "search" for or "seizure" of the fruits or instrumentalities of crime. In *Camara v. Municipal Court*, 387 U.S. 523, 526, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Court found that an administrative inspection for possible violations of a city's housing code was a "significant intrusion[ ]

upon the interests protected by the Fourth Amendment." The Court explained:

It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior. For instance, even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security.

*Id.* at 530–31, 87 S.Ct. 1727; *see also Michigan v. Tyler*, 436 U.S. 499, 506, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) ("Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment.").

◼ The County defendants' principal argument in opposition to plaintiffs' § 1983 claims is that the Fourth Amendment was not applicable to the activities of their social worker employees. In light of the Supreme Court's decision *Wyman, Comm'r of New York Dep't of Social Servs. v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), the County defendants argue, entries into private home by child welfare workers involve neither searches nor seizures under the Fourth Amendment, and thus can be conducted without either a warrant or probable cause to believe that a child is at risk of imminent harm.

The defendants misread *Wyman.*

At issue in that case was a regulation promulgated by the State of New York as part of its program of providing aid to dependent children (payments to families who qualified for welfare). The regulation required social workers to make an initial home visit and subsequent periodic visits for public financial aid to begin, and thereafter to continue. The Supreme Court concluded that, in view of the underlying benefits extended to the families receiving welfare, a caseworker's entry was not a "search by the New York social service agency in the Fourth Amendment meaning of the term." *Id.* at 317, 91 S.Ct. 381.

In reaching this conclusion, the Court considered: the public interest in insuring that state tax monies are spent on their proper objects and encouraging welfare recipients to return to self-sufficiency; the limited scope of the entry and its consensual nature; the fact that the recipients were entitled to advance notice; and the fact that all welfare recipients were subjected to the entries, which thus were not based on individualized suspicion of wrongdoing. *Id.* at 318–23, 91 S.Ct. 381. The Court also pointed out that there was no suggestion that the caseworker's visit had "as its purpose the obtaining of information as to criminal activity", *id.* at 321, 91 S.Ct. 381, and "is not a criminal investigation, does not equate with a criminal investigation, and ..., is not in aid of any criminal proceeding." *Id.* at 323, 91 S.Ct. 381.

In light of these considerations, the Court concluded:

[T]he visitation is not forced or compelled, and [ ] the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.

*Id.* at 317–18, 91 S.Ct. 381.

The circumstances of the recipients of state aid in *Wyman* differ significantly and substantially from those of the plaintiffs in this case. In *Wyman* the persons objecting to an intrusion into their homes had affirmatively sought a benefit to which they were not, ab initio, entitled: financial

support for their children. The state can lawfully condition the receipt of such benefits on various conditions, including comprehensive disclosure of the applicant's financial status. In addition, the state can lawfully take steps, such as periodic inspections of recipients' homes, to ensure that fraud is not occurring, and that the recipients remain entitled to continued benefits. Under *Wyman*, diminished privacy can be deemed a quid pro quo for receiving state welfare payments. The Court emphasized that the entry in *Wyman*, in contrast to the entry in *Camara*, was not forced or compelled; instead, it was accepted along with the state's financial support. *Id.* at 317, 91 S.Ct. 381.

Here, in contrast, the plaintiffs were not seeking anything from or asking anything of the state. They did not want the state to interfere with them or their family or to disturb them or their children. They wanted nothing from the state except to be able to enjoy their fundamental right to be left alone.

Moreover, the refusal to allow the home inspection in *Wyman* would result simply in termination of benefits. In this case, the plaintiffs were threatened with arrest (indeed, a jury could find that Mr. Walsh had been arrested, albeit briefly) and removal of their children. These are far more drastic consequences than a mere loss of state welfare monies.

The inspection in this case, unlike that involved in *Wyman*, had, as well, the overtones of a criminal, or at least quasi-criminal investigation. It was made clear to Mr. Walsh that if he continued to resist the demands for entry, and such entry were to occur anyway, he could expect to be cited for any "violations" that might be observed. Though not mentioned by the defendants during their efforts to persuade the plaintiffs to let them into their home, there was also the prospect of possible prosecution for contributing to the abuse or neglect of a child under the broadly worded provisions of O.R.C. §§ 2919.22(A), (B)(1).[2]

The confines of *Wyman* are narrow. *Reyes v. Edmunds*, 472 F.Supp. 1218, 1224 (D.Minn.1979) ("The majority opinion in *Wyman v. James* is not without conceptual problems, and, in view of the vigorous, persuasive three-judge dissenting opinions, the holding must be restricted to the boundaries imposed by the facts to avoid glaring inconsistency with prior search and seizure cases."). To suggest that the Fourth Amendment plays *no* role in the circumstances presented in this case is to extend *Wyman* far beyond those narrow confines. To accept the defendants' claims about the reach of *Wyman* would give the state unfettered and absolute authority to enter private homes and disrupt the tranquility of family life on nothing more than an anonymous rumor that something might be amiss.

Despite the defendants' exaggerated view of their powers, the Fourth Amendment applies to them, as it does to all other officers and agents of the state whose requests to enter, however benign or well-intentioned, are met by a closed door. There is, the defendants' understanding and assertions to the contrary notwithstanding, no social worker excep-

---

**2.** O.R.C. § 2919.22 provides:

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support . . . .
(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
(1) Abuse the child; . . . .

tion to the strictures of the Fourth Amendment. *See e.g., Roska v. Peterson,* 304 F.3d 982, 989 (10th Cir.2002) (warrantless no-knock entry violated Fourth Amendment absent exigency of imminent danger to child's welfare); *Calabretta v. Floyd,* 189 F.3d 808, 816 (9th Cir.1999) ("[*Wyman*] does not hold that the social worker may enter the home despite the absence of consent or exigency."); *Lenz v. Winburn,* 51 F.3d 1540, 1547 (11th Cir. 1995) (even though social worker's intrusion was motivated by concern for child's welfare, "and not as part of any investigation, the search falls within the ambit of the Fourth Amendment."); *Franks v. Smith,* 717 F.2d 183, 186 (5th Cir.1983) ("A section 1983 action can also lie against others, such as social workers, where actions by them were taken in their official capacity as state employees."); *U.S. v. Salome,* 1994 WL 542098, *2 (D.Kan.) ("There is no specific 'children's welfare' exception to the Fourth Amendment's warrant requirement.");*Katz v. New Hampshire Div. of Children and Youth Services,* 1994 WL 255230, *8 (D.N.H.); *State v. Boggess,* 115 Wis.2d 443, 340 N.W.2d 516, 521 n. 9 (1983); *State in Interest of A.R.,* 937 P.2d 1037, 1040 (Utah App.1997) ("the Fourth Amendment's prohibition on unreasonable searches and seizures applies whenever an investigator, be it a police officer, a DCFS employee, or any other agent of the state, responds to an alleged instance of child abuse, neglect, or dependency."); *In re Diane P.,* 110 A.D.2d 354, 494 N.Y.S.2d 881, 883–85 (App.Div.1985); *In re Robert P.,* 61 Cal.App.3d 310, 132 Cal.Rptr. 5, 11–12 (1976); *New Jersey Div.*

*of Youth & Family Servs. v. B.W. & V.W.,* 165 N.J.Super. 492, 398 A.2d 611, 613 (N.J.Juv. & Dom.Rel.Ct.1978).[3]

Plaintiffs advance four theories on which a Fourth Amendment violation might be found. They are entitled to proceed on each of their claims.

### 1. Warrantless Search of the Home/ Unlawful Entry

A central tenet of the Fourth Amendment is the requirement that searches occur only pursuant to warrants issued by a neutral and detached magistrate. Warrantless searches are *per se* unreasonable under the Fourth Amendment, except in a few carefully delineated instances. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This is so, because

> [a]n essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope. A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case.

*Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 621–22, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

Having not complied with the warrant requirement, the defendants must show that an exception to the warrant require-

---

**3.** If defendants' claim that the Fourth Amendment does not apply to their entries and inspections of private homes were well-founded, they would also be entitled to remove children without regard to the Fourth Amendment. Just as, however, the Fourth Amendment restricts entries and inspections into private homes, it applies also to the removal

of children by social workers. *See, e.g., Brokaw v. Mercer County,* 235 F.3d 1000, 1009 (7th Cir.2000); *Wallis v. Spencer,* 202 F.3d 1126, 1137 n. 8 (9th Cir.2000); *Tenenbaum v. Williams,* 193 F.3d 581, 601–06 (2d Cir.1999); *J.B. v. Washington County,* 127 F.3d 919, 928–31 (10th Cir.1997).

ment authorized their entry into plaintiffs' home. *See United States v. Rohrig*, 98 F.3d 1506, 1514–1515 (6th Cir.1996) ("In the absence of a warrant authorizing the officers' entry into Defendant's home, the Government must overcome the presumption that this entry was unreasonable."). A reasonable jury could find that the defendants could not meet that burden.

### a. Consent

A person can waive his or her Fourth Amendment right to be free of a warrantless search by providing voluntary consent. In *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir.1998), the Sixth Circuit explained:

> It is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search. The government has the burden of demonstrating that consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority. The proper analysis for determining the voluntariness of a detainee's consent is to consider the 'totality of the circumstances' of the alleged consent.

Voluntary consent requires the absence of any overt act or threat of force against the defendant; the absence of any promises to the defendant or any indication of "more subtle forms of coercion that might flaw his judgement"; ... [and] the absence of any indication that the defendant was a "newcomer to the law, mentally deficient, or unable in the face of custodial arrest to exercise a free choice; ...."

*United States v. Crowder*, 62 F.3d 782, 787 (6th Cir.1995) (citations omitted).

Darnold and Brown argue that they understood that Mr. Walsh had given consent to the search of plaintiffs' home. Under the totality of circumstances in this case, however, a reasonable jury could find that any putative consent given by Mr. Walsh was coerced by references to removal of the children if opposition continued; detention of the family; frisk of the father; the number, office, and power of the county officials and city officers present; and the apparent (or, at least threatened) arrest of Mr. Walsh for obstruction of official business.

Were the jury to find that some or all of these circumstances made the putative consent involuntary, such consent could not have lawfully opened the door to the social workers and police officer. In view of the assertions by Darnold that the she could and would declare an emergency and remove the children, and Brown's alleged blocking of the plaintiffs' driveway, there was, moreover, no rational basis for any belief on the social workers' part that Mr. Walsh had given voluntary consent. Their conduct was, a jury could find, as coercive in its effects as the statements and actions of the police defendants.

### b. Exigent Circumstances

Exigent circumstances may also justify a warrantless entry into a home. The Sixth Circuit has characterized the situations in which warrantless entries are justified as lying within one of four general categories: 1) hot pursuit of a fleeing felon; 2) imminent destruction of evidence; 3) the need to prevent a suspect's escape; and 4) a risk of danger to the police or others. *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir.1996); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir.1994).

The Supreme Court has most frequently cited the "risk of danger" exigency for warrantless entries in cases where the government is acting in something other than a traditional law enforcement capacity. For instance, in *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), the Court recognized

that a "burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'" Similarly, in *Camara,* the Court noted:

> [N]othing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. *See North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 [(1908)] (seizure of unwholesome food); *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 [(1905)] (compulsory smallpox vaccination); *Compagnie Francaise De Navigation a Vapeur v. Louisiana State Bd. of Health,* 186 U.S. 380, 22 S.Ct. 811, 46 L.Ed. 1209 [(1902)] (health quarantine); *Kroplin v. Truax,* 119 Ohio St. 610, 165 N.E. 498 [(1929)] (summary destruction of tubercular cattle). On the other hand, *in the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day.* Moreover, most citizens allow inspections of their property without a warrant. Thus, as a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should only be sought after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry.

387 U.S. at 539, 87 S.Ct. 1727 (emphasis supplied).

Defendants argue their entry into the home, even absent voluntary consent, was reasonable under the circumstances. They point to: the anonymous complaint about clutter, poor health care, overcrowding, and the childrens' alleged developmental disabilities; the alleged clutter on the front porch; and the plaintiffs' attempt to leave. These circumstances, the defendants argue, created an "emergency situation" that led Darnold and Brown reasonably to believe the Walsh children were in danger of imminent harm. Thus, their inspection, they contend, was reasonable under the circumstances.

The circumstances defendants rely on, however, do not provide a showing of imminent or likely harm sufficient to justify warrantless entry under the exigent circumstances exception. On the record before the court, the anonymous tip simply did not provide reason to believe that the children were at such risk of harm or injury that immediate action was necessary. The complaint gave no indication of the caller's basis for the allegation—it might equally have been based on personal observation, neighborhood rumor, malicious gossip, or personal animosity. The report's anonymity left it, moreover, without any basis for assessing the caller's veracity.

Observation of the "clutter" on the front porch did not remedy these deficiencies. At most, it may have suggested that someone in the chain of communication (the length of which was unknown) may, on some unspecified, and possibly remote occasion, have seen what he or she considered to be inadequate housekeeping. Who might have made that observation and formed that conclusion, and when and under what circumstances he or she did so were, and remain, utterly unknown.

More importantly, there is nothing inherently unusual or dangerous about cluttered premises, much less anything about such vaguely described conditions that could manifest imminent, or even possible danger or harm to young children. If household "clutter" justifies warrantless entry and threats of removal of children and arrest or citation of their parents, few families are secure and few homes are safe

from unwelcome and unjustified intrusion by state officials and officers.[4]

As the Sixth Circuit concluded in *Rohrig*, "the cases finding exigent circumstances uniformly cite the need for prompt action by government personnel, and conclude that delay to secure a warrant would be unacceptable under the circumstances." 98 F.3d at 1517. Defendants have not provided any evidence that the delay resulting from the time needed to obtain a search warrant would have placed any of the children at any risk of any harm whatsoever. They have failed to show that any exigency that justified warrantless entry was necessary to protect the welfare of the plaintiffs' children. In this case a rational jury could find that "no evidence indicates that [plaintiffs' children were] in immediate threat of death or severe physical harm—indeed, the evidence points to the opposite conclusion" and a lack of "sufficient exigent circumstances to relieve the state actors here of the burden of obtaining a warrant." *Roska v. Peterson*, 304 F.3d 982, 990 (10th Cir.2002).

### c. Special Needs

■ In the criminal context, the reasonableness of a governmental search requires a showing of probable cause. *See, e.g., Skinner*, 489 U.S. at 619, 109 S.Ct. 1402. The probable cause standard, however, "is peculiarly related to criminal investigations" and may be unsuited to determining the reasonableness of searches where the "Government seeks to *prevent* the development of hazardous conditions." *National Treasury Employees v. Von Raab*, 489 U.S. 656, 667–68, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (internal quotation marks and citations omitted).

As the Supreme Court stated in *Board of Education v. Earls*, 536 U.S. 822, 122 S.Ct. 2559, 2564, 153 L.Ed.2d 735 (2002): "In limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Von Raab*, 489 U.S. at 668, 109 S.Ct. 1384. Therefore, in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). *See also Ferguson v. City of Charleston*, 532 U.S. 67, 79, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (stating that public officials can justify warrantless searches with reference to a special need "divorced from the State's general interest in law enforcement").

■ Where an intrusion serves special needs, a court must "employ[ ] a balancing test that weigh[s] the intrusion on the individual's interest in privacy against the 'special needs' that support[ ] the program." *Ferguson*, 532 U.S. at 78, 121 S.Ct. 1281; *see also Von Raab*, 489 U.S. at 665, 109 S.Ct. 1384 (court is "to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.").

Defendants urge this court to apply the "special needs" balancing test to conclude

---

4. Indeed, the trauma of uninvited intruders and the disruption they cause may well be more harmful to the welfare of a family's children than any amount of clutter, disarray, or disorder. At least that is, in effect, what plaintiffs allege in their claim for intentional infliction of emotional distress.

that the plaintiffs' privacy interest in their home was minimal compared to the county's compelling interest in securing entry over their objection to determine whether the anonymous report had any validity.

■ A privacy interest in the home is not minimal or *de minimus*. The Supreme Court has long held that citizens have an especially strong expectation of privacy in their homes. *See, e.g.; United States v. United States District Court,* 407 U.S. 297, 312, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry into the home is the chief evil against which the ... Fourth Amendment is directed."); *Miller v. United States,* 357 U.S. 301, 307, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) ("Such action invades the precious interest in privacy summed up in the ancient adage that a man's house is his castle.").

■ In addition, the Supreme Court has recognized the inherent sanctity of the family and its entitlement to constitutional protection. *See, e.g., Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (citations omitted) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ... the Equal Protection Clause of the Fourteenth Amendment ... and the Ninth Amendment"). The Constitution's protection is not lost simply if parenting standards are not what some might view as ideal or even desirable. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents....").

■ Against these fundamental rights, the defendants contend that Ohio's statutory framework for learning about and investigating allegations of child abuse and neglect supersede their obligations under the Fourth Amendment. They point principally to § 2151.421 of the Ohio Revised Code as authority for their warrantless entry into and search of the plaintiffs' home.

That statute imposes a duty on county agencies to investigate a report of known or suspected child abuse within twenty-four hours of receiving the report.

Defendants, however, cannot read this statute as allowing a warrantless search under the circumstances in this case. Defendants could have followed the confines of the statute and investigated the report by following proper Fourth Amendment procedure.

Furthermore, Darnold admits that by making an appointment with the health inspector, she commenced an investigation—thus fulfilling her statutory duty.

■ To the extent that § 2151.421(F)(1) and other provisions of the Ohio Administrative Code provided by the defendants might be viewed as leaving no role for the Fourth Amendment, defendants' argument cannot be sustained. State statutes and regulations cannot displace the protections of the United States Constitution. If that is defendants' premise, it is entirely erroneous, even when the state acts to protect the welfare of children. *Cf, Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (restrictions on tobacco advertising within 1,000 foot radius of a school impermissibly contravened the First Amendment).

There can be no doubt that the state can and should protect the welfare of children who are at risk from acts of abuse and neglect. There likewise can be no doubt that occasions arise calling for immediate response, even without prior judicial approval. But those instances are the exception. Otherwise child welfare workers would have a free pass into any home in

which they have an anonymous report of poor housekeeping, overcrowding, and insufficient medical care and, thus, a perception that children may be a some risk.

This is not to say that the defendants could have done nothing in response to the phone call. They could, as they did, contact the plaintiffs to request their help in resolving any questions they may have had as a result of the phone call. But once the plaintiffs declined to be responsive, the defendants were obligated by the Constitution to depart, and to leave the plaintiffs alone and in peace until such time as more information was learned from other, and more trustworthy sources. If, at that point, the plaintiffs refused to cooperate, defendants had several options, including filing of an abuse or neglect complaint and seeking an emergency removal order pursuant to OHIO R. JUV. PROC. 13. Having elected to forego those options, the defendants, a reasonable jury could find, violated the Fourth Amendment when they went into the plaintiffs' home without either a warrant or sufficient justification to conduct a warrantless entry.

### 2. Excessive Search

 Plaintiffs also allege the scope and intrusiveness of defendants' search exceeded restrictions imposed by the Fourth Amendment. For a search to be reasonable, and thus lawful under the Fourth Amendment, it must be "reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

In addition to observing whatever could be seen in plain view, the defendants had Mr. Walsh open cupboards, drawers, the refrigerator, and locked cabinets. The defendants have not met their burden of showing that he did so voluntarily. A rational jury could, in any event, find that he did so as a result of the same coercive pressures that would support a finding that his consent to the entry into the family home was involuntary.

Absent valid consent, a search of cupboards, drawers, the refrigerator, and locked cabinets was, a rational jury could find, excessive, and exceeded any legitimate protective purpose that might have been pursued on the basis of the anonymous phone call. Nothing in that call indicated that the children were endangered by something, such as drugs or firearms, that might have been concealed in those areas. There was, accordingly, no basis to look there, and thereby intensify the intrusion into the plaintiffs' privacy.

Even if the entry could be sustained on the basis of exigent circumstances, the scope of the ensuing search was, in Fourth Amendment terms, a general search, conducted at the whim and controlled solely by the discretion of the defendants. This is precisely the kind of general search, an "exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564, (1971), that "the Framers of the Fourth Amendment most strongly opposed." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564, (1995) (citing W. Cuddihy, The Fourth Amendment: Origins and Original Meaning (1990) (Ph.D. Dissertation at Claremont Graduate School)) (O'Connor, J., dissenting).

Therefore, defendants' motion for summary judgment as to plaintiffs' excessive search claim is denied.

### 3. Unlawful Detention

 Plaintiffs also allege that, by blocking their vehicle, defendants prohibited their departure and unlawfully detained their freedom of movement in violation of the Fourth Amendment.

The Supreme Court held in *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980):

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

The Court also stated that a "person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553, 100 S.Ct. 1870.

Plaintiffs allege that Darnold's vehicle blocking their driveway, combined with Brown's statement that the police were coming with a search warrant, caused them reasonably to apprehend that their freedom of movement was curtailed. A reasonable jury could agree with this contention, and find that the plaintiffs had been detained.

A reasonable jury could also conclude that there was no sufficient basis for detaining the plaintiffs, because the detention was based on an entirely speculative suspicion, rather than articulable facts, that the plaintiffs intended to flee. Even if the plaintiffs had desired to get away from the social workers and police officers and their demands that they be allowed to go into their home without a warrant, the defendants had no legitimate basis for detaining them. The information on which the defendants were acting—the anonymous phone call—did not provide a reasonable basis for concluding that the children were

in any imminent danger. Absent such basis, the defendants could not lawfully control the plaintiffs' freedom of movement. A social worker cannot place a family under house arrest simply on the basis of an anonymous report of bad parenting and her observation of "clutter" on a front porch.

Defendants' motion for summary judgment as to plaintiffs' unlawful detention claim is denied.

### 4. Arrest, Unlawful Detention, and Frisk of Mr. Walsh

Plaintiffs also allege that the arrest (or, were a jury to find that he had not been arrested, the detention) and frisk of Mr. Walsh without a warrant violated his Fourth Amendment rights.

#### a. Arrest

 Mr. Walsh claims that Sergeant Chandler stated: "I am taking you into custody for obstruction of official business." Thereafter, Sergeant Chandler placed Mr. Walsh against defendant Darnold's automobile and gave him a "patdown" or frisk. Brown testified: "The officer had said something to the effect of he was being arrested, or whichever terminology he used." (Brown Dep. at 37). Brown also testified that Chandler "started to Mirandize him." (*Id.* at 38). Darnold testified: "When I arrived .... Mr. Walsh was spread on my vehicle with an officer patting him down. And I remember overhearing the officer reading the rights." (Darnold Dep. at 108). This evidence, if credited despite Sgt. Chandler's contention that he had not arrested Mr. Walsh, would support a rational jury's finding that Sgt. Chandler had arrested Mr. Walsh.

 The arrest of a person is "quintessentially a seizure" under the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63

L.Ed.2d 639 (1980). For a warrantless arrest to be lawful, the officer must have probable cause to believe that the arrestee has committed or is committing a crime. *See, e.g., Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988).

Were the jury to find that Sgt. Chandler had arrested Mr. Walsh, it could also find that he did not have probable cause to do so for the crime of obstruction of justice.

Ohio Rev.Code § 2921.31, entitled "Obstructing official business," provides:

(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

■ The statute requires some "act that hampers or impedes" a police officer. Doing nothing in response to an officer's command is not an "act" under § 2921.31. *Columbus v. Michel,* 55 Ohio App.2d 46, 47, 378 N.E.2d 1077 (Ohio App.1978) (refusal to open apartment door not an "act"). In addition, the officer must be in the performance of an "authorized act." That requirement cannot be met where the officer's act is not authorized by law. *See State v. Gillenwater,* 1998 WL 150354, *5 (Ohio App.) ("we do not believe that the legislature intended the obstructing official business statute, R.C. 2921.31, to punish individuals who decide not to submit to a *Terry* stop and frisk.").

In this case a jury could, moreover, find that there was no lawful basis for arresting Mr. Walsh because, for the reasons discussed in the preceding sections of this opinion, there was no lawful authority for the defendants' actions. At most, the jury could find, Mr. Walsh refused to allow the defendants to enter without a warrant, and sought to leave with his family. Under the circumstances of this case, neither act violated Ohio law.

Thus, defendants' motion for summary judgement is denied as to Mr. Walsh's Fourth Amendment claim based on his arrest for obstructing justice.

**b. The Stop or Unlawful Detention**

■ The Supreme Court, in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), made clear that a detention need not go so far as to be an actual arrest to be a "seizure" for purposes of the Fourth Amendment. The Court explained: "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." The Court elaborated on the definition of a "stop" in *Mendenhall:* "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. at 554, 100 S.Ct. 1870.

■ An investigatory stop can be based on reasonable suspicion; a showing of probable cause is not required:

[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the

facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

*Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868 (citations omitted).

While disputing Mr. Walsh's contention that he was arrested, the City defendants do not argue that he was not detained, in Fourth Amendment terms, when he was placed against Darnold's car. They argue, rather that, because Mr. Walsh seemed very agitated, nervous, and angry, any such detention was lawful. Sergeant Chandler points out that Mr. Walsh continuously went in and out of his home, and Sgt. Chandler did not know if Mr. Walsh was doing so to arm himself with a knife or a gun. Also, Sgt. Chandler claims he was suspicious when the plaintiffs attempted to leave. By stopping and frisking Mr. Walsh, Chandler claims he was acting in the best interests of himself, the other officers, the social workers, and the Walsh family.

In response, plaintiffs assert that Sgt. Chandler acted without reasonable suspicion, based on legitimate, articulable facts, that Mr. Walsh was about to commit a crime and was armed and dangerous.

■■■ The plaintiffs are correct: Sgt. Chandler points to no facts that would justify a reasonable officer in the belief that Mr. Walsh was, or was about to become armed and dangerous. The record evinces no prior acts of violence, much less armed violence on his part. Agitation and nervousness in the face of threats to enter a home without a warrant, be placed under arrest, and have one's children removed does not give rise to a reasonable apprehension that violence is likely. Had Sgt. Chandler had any actual, as opposed to speculative, concerns about Mr. Walsh's re-entry into the home to retrieve a weapon, he could have asked, as he later did on

entering the premises, whether there were any firearms in the house. Had he done so, he would have been told that there were no guns on the premises—which sufficed to relieve Sgt. Chandler's apprehensions once he and the social workers were in the house. Sgt. Chandler remained in the living room while the social workers, accompanied by Mr. Walsh, conducted their search of the other rooms.

In light of this evidence, a rational jury could find that Sgt. Chandler's expressed concerns about the possibility that Mr. Walsh was armed and dangerous were unfounded or not credible. In which case, it could properly return a verdict in favor of Mr. Walsh on his claim of unlawful detention in violation of the Fourth Amendment.

Therefore, defendants' motion for summary judgment on this claim is denied.

### c. Frisk

■■■ Under the *Terry* standard, to conduct a frisk, the officer must have a reasonable suspicion that the detainee is "armed and presently dangerous to the officer or to others." *Id.* at 23–24, 88 S.Ct. 1868.

As the Court stated in *Ybarra v. Illinois,* 444 U.S. 85, 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979):

The *Terry* case created an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he accosted. Nothing in *Terry* can be understood to allow generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk

for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . . .

Mr. Walsh alleges that Sergeant Chandler frisked him while Mr. Walsh was spread-eagled on Darnold's automobile. As noted above, Sergeant Chandler argues Mr. Walsh seemed agitated and he did not know if Mr. Walsh had fetched a knife or a gun in one of his trips in and out of his house. Therefore, Chandler argues he was acting in the best interests of himself, the other officers, the social workers, and the Walsh children.

For the reasons enunciated in the preceding section, a jury could find in favor of Mr. Walsh and against Sgt. Chandler as to this claim. If the detention was not lawful, neither was the frisk.

Thus, defendants' summary judgment motion as to plaintiffs' claim that Chandler's frisk violated Mr. Walsh's Fourth Amendment rights is denied.

### B. Fourteenth Amendment

■ The Supreme Court has recognized some of the most important personal bonds necessary for the protection of individual freedom "are those that attend the creation and sustenance of a family." *Roberts v. United States Jaycees*, 468 U.S. 609, 619, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The Court has consistently recognized rights involving private family life as worthy of special constitutional protection. *See, e.g., Moore v. City of Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) ("The Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.").

Plaintiffs claim that Mr. Walsh's arrest and detention and ensuing compelled consent to the search of the family home violated the family's constitutional interest in the inviolability of their family unit. They assert that the defendants required Mr. Walsh to choose between his personal freedom and the inviolability of his family, on the one hand, and consenting involuntarily to an unconstitutional warrantless search, on the other. Therefore, plaintiffs assert, the defendants intentionally and unlawfully drove a wedge between Mr. Walsh and his family to compel him to let them into the family home.

The Sixth Circuit has not delineated the elements of a claim for breach of the right of family integrity and autonomy. The First Circuit has, however, concluded that "to establish a violation of a right to familial associational privacy, the state action must be directly aimed at the parent-child relationship." *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir.1991). As that court explained the precedents:

> could be divided into two categories of constitutional protections. Under the first category, substantive due process has been applied to prevent government interference in certain particularly private decisions. Regarding the second category, the Court has recognized that there is a liberty interest in "preventing government interference with the rearing of young children." This second category is implicated whenever the state directly seeks to change or affect the parent-child relationship. State action that affects the parental relationship only incidentally, however, even though the deprivation may be permanent, as in the case of unlawful killing by the police, is not sufficient to establish a violation of an identified liberty interest.

*Id.* (citations omitted).

Plaintiffs allege a deprivation of their liberty interest in the autonomy of their family. This claim, is, however, derived from and incidental to defendants' violations of plaintiffs' Fourth Amendment rights. Plaintiffs have provided no evidence that defendants intentionally acted to diminish or deprive them of their famil-

ial relationship with each other. Thus, plaintiffs do not have a cognizable claim for interference with the parent-child relationship because the defendants' conduct was not directed specifically toward disrupting the family relationship.

Moreover, plaintiffs have not suffered a permanent, physical loss of association. As the court concluded in *Divergilio v. Skiba,* 919 F.Supp. 265, 269 (E.D.Mich. 1996):

> If the Sixth Circuit would be unwilling to recognize a cause of action for deprivation of the parent-child relationship in a case of wrongful death, where the relationship has been irrevocably severed incidental to the family member's death, the Court cannot conceive recognition of the cause of action for the incidental diminution in quality of the protected relationship alleged in this case.

■ Not every tort at common law implicates a constitutional remedy. To recover under § 1983 for deprivation of a protected relationship, a plaintiff must prove that the governmental action was directed toward a protected aspect of that relationship and that any injury was not merely incidental to the action taken. *Id.* Absent a showing of directed state action, there is no constitutional claim.

Therefore, defendants' motion as to plaintiff's Fourteenth Amendment claim is granted.

### C. Ohio Constitution

Plaintiffs argue the violations of the Fourth and Fourteenth Amendments of the federal Constitution also violate Article I, §§ 14 and 16 of the Ohio Constitution.

In *State v. Robinette,* 80 Ohio St.3d 234, 238, 685 N.E.2d 762 (1997), the Supreme Court of Ohio stated: where the provisions are similar and no persuasive reason for a differing interpretation is presented, this court has determined that protections afforded by Ohio's Constitution are coextensive with those provided by the United States Constitution. The language of Section 14, Article I of the Ohio Constitution and the Fourth Amendment is virtually identical. Accordingly, this court has interpreted Section 14, Article I of the Ohio Constitution as affording the same protection as the Fourth Amendment.

■ Likewise, "due course of law" under § 16 of the Ohio Constitution has the same meaning as "due process of law" under the federal Constitution. Thus, there is no difference respecting due process of law in the Constitution of the United States and that of Ohio. 17 Oh Jur Constitutional § 490 (West 2002).

Because plaintiffs' claims based on the Ohio Constitution use the same analysis as the Fourth Amendment and Fourteenth Amendment claims noted above, defendants' motions are therefore denied on the § 14 claim and granted on the § 16 claim.

### D. Qualified Immunity

■ The defendants argue that, even if they committed one or more federal constitutional violations, they are entitled to the defense of qualified immunity. This defense, as the Supreme Court made clear in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), is determined on the basis of an objective standard: namely whether an officer's conduct violated clearly established constitutional rights of which a reasonable person would have known.

■ Under the *Harlow* standard, a court must first determine whether the plaintiff has alleged a deprivation of a constitutionally protected right. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, "then the second step is to determine whether the right is so 'clearly established' that a 'reasonable official' would understand that what he is

doing violates that right." *Brennan v. Township of Northville,* 78 F.3d 1152, 1154 (6th Cir.1996) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

██ To find a clearly established constitutional right, a district court must find binding precedent from the Supreme Court, its court of appeals, or itself. *Ohio Civil Serv. Employees Ass'n. v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988).

Plaintiffs' allegations, if true and accepted by the jury, establish several Fourth Amendment violations. Therefore, the remaining issue is whether the Fourth Amendment rights violated by the defendants were so clearly established that a reasonable government official would understand that his or her conduct violated that right.

██ The reasonable official test includes a factual as well as a legal component:

> The relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [defendants'] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. [Defendants'] subjective beliefs about the search are irrelevant.

*Anderson,* 483 U.S. at 641, 107 S.Ct. 3034.

### 1. Darnold, Brown, Chandler, and Kish

██ Darnold and Brown argue a reasonable caseworker would have believed her actions to have been lawful. In support of this contention, they assert that: they were required by Ohio law to investigate all complaints within twenty-four hours; they were trained to consider all reports as true and, therefore, the Walsh children were in imminent danger of harm; they entered the Walsh home under the reasonable impression that Mr. Walsh consented to the inspection; they were not trained in Fourth Amendment law; and the law is unclear whether a social worker must obtain a search warrant to investigate allegations of child abuse.

Defendants Chandler and Kish argue they are entitled to qualified immunity because state law required the social workers to investigate a report of suspected child abuse within twenty-four hours. Therefore, any searches or seizures are protected by qualified immunity because a reasonable officer could have reasonably believed that plaintiffs were interfering with a statutorily mandated investigation.

In essence, both the County and City defendants claim that it was reasonable for them to believe that social workers are exempt from the requirements of the Fourth Amendment. To be able to rely on such exemption, the defendants must show that it was clearly established at the time of their investigation and ensuing actions.

This they cannot do, because neither the Supreme Court nor the Sixth Circuit has addressed whether there is a social worker exception to the Fourth Amendment. Therefore, it was not reasonable for defendants to conclude that social workers are not required to comply with Fourth Amendment.

██ Even if the defendants have no obligation to show that a social worker exemption was clearly established, so that they could rely on such exemption as a defense to their actions, any claim by them that the plaintiffs' rights were not clearly established is unavailing. Basic and applicable Fourth Amendment principles were clearly articulated and firmly embedded in our constitutional jurisprudence well before the events giving rise to this suit: government officers cannot enter a home without either prior court approval, consent, or exigent circumstances; the scope of a search is limited by its justification;

all persons are entitled to freedom of movement absent reasonable suspicion of criminal or other unlawful activity; no arrest can be made without probable cause; and no search of an individual for weapons can be undertaken unless incident to a lawful arrest or on an articulable basis for believing he or she is armed and dangerous. These are bedrock principles that the law properly presumes are known to every agent of the state who seeks to enter a private home—even in the name of ensuring a child's welfare.

Several courts have rejected caseworker demands for qualified immunity from Fourth Amendment claims. Most recently, in *Roska v. Peterson*, 304 F.3d 982, 998–1000 (10th Cir.2002) (citing *Franz v. Lytle*, 997 F.2d 784, 791–92 (10th Cir. 1993)), the Tenth Circuit, after rejecting the contention that there is a "special needs" exception to the warrant requirement in cases involving the removal of children from their homes, also rejected the defendants' assertion of qualified immunity. *Accord, Calabretta v. Floyd*, 189 F.3d 808, 815–16 (9th Cir.1999); *Katz v. New Hampshire Div. of Children and Youth Services*, 1994 WL 255230, *9 (D.N.H.); *Chavez v. Board of County Comm'rs of Curry County*, 130 N.M. 753, 31 P.3d 1027, 1035 (N.M.App.2001).

█ Defendants Darnold and Brown assert that they are entitled to prevail on their claim of qualified immunity because they had not had training in Fourth Amendment law. That subjective basis for their ignorance about and actions in violation of the Fourth Amendment does not relieve them of the consequences of that ignorance and those actions. As noted, the standard is objective, not subjective: qualified immunity is related to what a reasonable official would have known, not what an individual defendant did or did not know. Objectively viewed, a state agent whose duties take her into private homes is deemed to know about the basic constitutional constraints on her activities.

█ The defendants' contention that they had been trained to act and were acting in response to the command of Ohio law is equally unavailing. As discussed above, the statute and regulations on which they claim to rely mandate investigations only. Nothing in Ohio law compels or authorizes nonconsensual entry into a private residence on the basis of an anonymous and conclusory allegation of allegedly dangerous conditions. Ohio law did not require the defendants to act as they did, and they cannot take refuge behind their misapplication of that law to avoid liability to the plaintiffs.

The fact that there is no Sixth Circuit precedent on the question of the extent to which social workers are or are not covered by the Fourth Amendment is not a basis for extending immunity to them. As noted, the basic doctrines are well-fixed in our constitutional jurisprudence. The absence of a decision directly on point is immaterial:

[A] prior case on all fours is not necessary; a public official may not manufacture immunity by inventing exceptions to well settled doctrines for which the case law provides no support. It evidences no lack of concern for the victims of child abuse or lack of respect for the problems associated with its prevention to observe that child abuse is not sui generis in this context. The Fourth Amendment case law has been developed in a myriad of situations involving very serious threats to individuals and society, and we find no suggestion there that the governing principles should vary depending on the court's assessment of the gravity of the societal risk involved. We find no indication that the principles developed in the emergency situation cases we have heretofore dis-

cussed will be ill suited for addressing cases like the one before us.

*Good v. Dauphin County Social Servs. for Children and Youth,* 891 F.2d 1087, 1094 (3rd Cir.1989). *Accord, Roska, supra,* 304 F.3d at 998 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.... [T]he salient question ... is whether the state of the law ... gave [defendants] fair warning that their alleged [actions were] unconstitutional.") (citing *Hope v. Pelzer,* 536 U.S. 730, ——, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002)); *But see Ross v. State of Ala.,* 15 F.Supp.2d 1173, 1183 (M.D.Ala.1998) (state of law under Fourth Amendment not clearly settled where caseworker was required by law to conduct the investigation).

 The defendant officers, Sgt. Chandler and Chief Kish, cannot reasonably claim that they, as reasonable law enforcement officers, would not reasonably have known basic Fourth Amendment doctrines relating to arrests, detentions, and searches. No reasonable officer could believe that he could arrest someone without probable cause, be unaware of the elements of the obstruction of justice statute, detain a family without probable cause or a reasonable basis to believe that its children were in imminent harm, believe that consent to enter private premises could be procured by threats and other coercive action, or search an individual without probable cause or a reasonable belief that he was armed and dangerous. No reasonable officer, moreover, could have rationally believed that the anonymous phone call provided sufficient justification to take any of those actions.

The claims of defendants Darnold, Brown, Chandler, and Kish of qualified immunity are therefore denied.

### 2. Riggs

Because plaintiffs have not established that Defendant Riggs violated any clearly established constitutional right, his motion for summary judgement is granted.[5]

### Failure to Train

Plaintiffs allege that ECDJFS, the Board, the City, and Chief Kish failed to provide proper training to their employees and failed to promulgate policies designed to protect civil rights. With regard to ECDJFS, I agree; with regard to the Board, the City, and Chief Kish, I disagree.

In *Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court stated that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." More specifically,

the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.... Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.

*Id.* at 388–89, 109 S.Ct. 1197 (citations omitted).

 Evidence of deliberate indifference need not be direct:

[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy-

---

**5.** Plaintiffs have also failed to provide any evidence that defendant Riggs violated any

state laws. Therefore, the motion on behalf of Riggs is granted in its entirety.

makers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390, 109 S.Ct. 1197.

There must, however, be a causal link between failure to train and the constitutional violation. To ascertain this link, a court must ask, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.* at 391, 109 S.Ct. 1197.

 Plaintiffs allege ECDJFS did not train its caseworkers in applicable Fourth Amendment principles. That contention can hardly be disputed in light of testimony by Darnold and Brown that they were not trained in Fourth Amendment law, much less understood its restraints on their conduct. Any agency that expects to send its employees routinely into private homes has a fundamental obligation to ensure that those employees understand the constitutional limits on their authority. Thus, because the duties assigned to ECDJFS caseworkers make the need for Fourth Amendment training obvious, and because Darnold and Brown's lack of training is closely related to their violation of plaintiffs' constitutional rights, the motion for summary judgment on plaintiffs' failure to train claim against ECDJFS is denied.

The motions for summary judgment on behalf of the Board, the City, and Chief Kish, however, are granted. Plaintiffs have provided no evidence that any of these three defendants had policies that were deliberately indifferent to the constitutional rights of plaintiffs or that the City or Chief Kish inadequately trained the City's police officers or that any such inadequacy led to the plaintiffs' constitutional injuries.

### Official Policies

Plaintiffs' third cause of action alleges defendants Darnold, Brown, Chandler,

Riggs, and Kish acted pursuant to official policies, plans, and training when they entered the Walsh home without a warrant, arrested Mr. Walsh, and blocked the Walsh driveway. Because the individual defendants were acting pursuant to official policy, plaintiffs assert that the Board, ECDJFS, the City, and Chief Kish authorized and approved the conduct and are therefore liable for any constitutional violations.

 Local governmental bodies may be sued under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Furthermore, local governments "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690, 98 S.Ct. 2018; *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 ("Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law.").

 Municipal liability, however, is not based on the concept of respondeat superior:

Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other

words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

\* \* \* \* \* \*

It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell,* 436 U.S. at 691, 694, 98 S.Ct. 2018.

■ Plaintiffs allege that ECDJFS caseworkers are not trained in Fourth Amendment law, but, instead, they are trained to "persuade" parents to surrender access to their homes by warning that refusal would result in removal of the children, citations for conditions in the home, or other police action.

Plaintiffs have provided no evidence, however, that ECDJFS has an official policy or custom of depriving individuals of their Fourth Amendment rights. It is undisputed that the plaintiffs' request for a search warrant was the first time an ECDJFS caseworker was confronted with this situation. Furthermore, both Darnold and Brown testified that they are trained to contact the agency and law enforcement if they are denied access for an inspection. Thus, there is no evidence that ECDJFS had an official policy or custom to deprive individuals of their constitutional rights to gain access to their homes.

■ Plaintiffs also argue that because Chief Kish is a policy maker, the City is liable for his constitutional violations.

In *City of St. Louis v. Praprotnik,* 485 U.S. 112, 113, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), a plurality of the Supreme Court held that an "official policy" is a policy adopted by someone with final policymaking authority with respect to the action ordered.

The Court in *Pembaur v. Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), explained how an official policymaker can be liable:

Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.

The Supreme Court's illustration in *Pembaur* demonstrates how narrowly the law defines "final policymaker":

For example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability.... Instead, if county employment policy was set by the Board of County Commissioner, only that body's decision would provide a basis for county liability.

This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decision *would* represent county policy and could give rise to municipal liability.

475 U.S. at 483 n. 12, 106 S.Ct. 1292.

Defendant Kish's position is similar to that of the county sheriff, whom the Supreme Court in *Pembaur* gave as an example of an official who is not a final decisionmaker. Thus, even if Kish exercised his

discretion to violate plaintiffs' Fourth Amendment rights, his was not a decision of the City of Vermilion.

Thus, because plaintiffs cannot prove that the City and County entity defendants can be liable through a respondeat superior theory, and they have not provided evidence that the County or City entity defendants had a custom or practice of depriving individuals of their Fourth Amendment rights, the County and City defendants' motions are hereby granted on this claim.

**State Law Claims: Counts IV—VII:**

Plaintiffs assert various state law claims against County and City defendants. Raising immunity as a defense, defendants seek judgment on these claims.

**A. Ohio's Immunity Statute**

 The Political Subdivision Tort Liability Act, codified in O.R.C. Chapter 2744, prescribes a three-tiered analysis for determining whether a political subdivision is immune from liability.

First, § 2744.02(A)(1) sets forth the general rule of immunity:

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to a person or property allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

Once immunity is established, the second tier of analysis is whether any of the five exceptions to immunity in § 2744.02(B) apply. These include: (1) negligent operation of a motor vehicle by political subdivision employees while in the scope of their employment; (2) negligent performance of acts by employees with respect to proprietary functions of political subdivisions; (3) failure to keep public roadways in repair and free from nuisance;

(4) negligence of employees within or on the grounds of government buildings; and (5) liability expressly imposed on the subdivision by a section of the Revised Code.

Under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that one of the defenses of O.R.C. § 2744.03 applies.

In this case, the City is immune from all state law claims. Plaintiffs have failed to demonstrate that any exceptions apply to the City. ECDJFS and the Board are immune from all claims except the claims for false arrest, as discussed below.

Section 2744.03 also provides immunity limitations for employees of political subdivisions. That section provides, in part:

> (6) * * * [T]he employee is immune from liability unless one of the following applies:
>
> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Liability is expressly imposed upon the employee by a section of the Revised Code.

 Whether an individual employee is entitled to immunity is a question of law. *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992). Immunity will attach to the conduct of political subdivision employees if one of the exceptions does not apply. *Miller v. Leesburg*, 87 Ohio App.3d 171, 175, 621 N.E.2d 1337 (1993).

**B. False Arrest/False Imprisonment**

Plaintiffs allege defendant Brown falsely arrested the Walsh family by blocking their driveway with Darnold's automobile

and preventing their freedom of movement. Mr. Walsh also claims defendants Chandler and Kish falsely arrested him by detaining and arresting him. Plaintiffs claim defendants ECDJFS, the Board, and the City are vicariously liable for the acts of the individual defendants.

### 1. Defendant Brown

 Plaintiffs argue defendant Brown lost her immunity by acting maliciously, in bad faith, or in a wanton or reckless manner.[6] The County Defendants argue that Brown did not act in such an egregious manner so as to lose her immunity; more importantly, defendants argue plaintiffs cannot prove a claim of false arrest.

As the Supreme Court of Ohio explained in *Rogers v. Barbera*, 170 Ohio St. 241, 243, 164 N.E.2d 162 (1960):

> In a false arrest, false imprisonment exists, but the detention is by reason of an asserted legal authority to enforce the processes of the law .... In false imprisonment, the essence of the tort consists in depriving the plaintiff of his liberty without lawful justification; and the good intention of the defendant does

not excuse, nor does his evil intention create, the tort.

*See also Feliciano v. Kreiger*, 50 Ohio St.2d 69, 71, 362 N.E.2d 646 (1977) ("False imprisonment has been succinctly defined in the following manner: 'to confine one intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short.'" (citations omitted)).

If Brown blocked the driveway, she restrained plaintiffs' freedom of movement without lawful justification. Also, a jury could find her actions to have been reckless, especially in light of the alleged threats to declare an emergency, remove the children, and order citations against the plaintiffs if they did not cooperate with the investigation.

Thus, there is a question of fact whether Brown acted recklessly and whether she falsely imprisoned the plaintiffs. Her motion for summary judgment is therefore denied.

### 2. The Board and ECDJFS

 Plaintiffs argue the Board and ECDJFS do not enjoy political subdivision immunity because they fall within the ex-

---

**6.** "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814 (1995); *Piro v. Franklin Twp.*, 102 Ohio App.3d 130, 139, 656 N.E.2d 1035 (1995). "Bad faith" includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive. *Cook*, 103 Ohio App.3d at 90–91, 658 N.E.2d 814; *Piro*, 102 Ohio App.3d at 139, 656 N.E.2d 1035.

"Wanton" misconduct may be described as a degree greater than negligence. *Ruth v. Jennings*, 136 Ohio App.3d 370, 375, 736 N.E.2d 917 (1999). The conduct is characterized by "the failure to exercise any care toward one to whom a duty of care is owed when the failure occurs under circumstances for which the probability of harm is great and when the probability of harm is known to the

tortfeasor." *Id.* (citations omitted). An individual acts "recklessly" when he "does an act or intentionally fails to do an act which is in his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Id.* (citations omitted)

Because the line between wanton or reckless misconduct and ordinary negligence can be a fine one, "the issue of whether conduct was willful or wanton should be submitted to the jury for consideration in light of the surrounding circumstances when reasonable minds might differ as to the import of the evidence." *Brockman v. Bell*, 78 Ohio App.3d 508, 517, 605 N.E.2d 445 (1992).

ception in § 2744.02(B)(1) for negligent operation of a motor vehicle by an employee within the scope of employment.

Defendants have failed to address this allegation, and a jury could reasonably find that Brown was acting within the scope of her employment when she blocked the plaintiffs' driveway. Summary judgment on this claim is, therefore, denied.

### 3. Chandler and Kish

 To escape liability for false arrest or false imprisonment, the defendant has the burden of proving legal justification for his or her actions. *Isaiah v. Great Atlantic & Pacific Tea Co.*, 111 Ohio App. 537, 541, 174 N.E.2d 128 (1959).

Chandler and Kish argue they were legally justified in seizing Mr. Walsh, and thus deserve summary judgment, because he looked nervous and agitated, he repeatedly went inside and out of the home, and he attempted to leave the premises.

 The tort of false imprisonment and arrest in Ohio are dependent on the lawfulness of the detention under federal constitutional standards. *Harvey v. Horn*, 33 Ohio App.3d 24, 28, 514 N.E.2d 452 (1986).

For the reasons previously stated with regard to plaintiffs' Fourth Amendment claims, a reasonable jury could conclude that plaintiff's arrest lacked any lawful basis. Furthermore, given the apparent lack of lawful basis, a reasonable juror could conclude that Chandler and Kish manifested a wanton and reckless abuse of official state power. They are, therefore, not immune for these acts under state law.

### C. Assault and Battery

 Plaintiffs allege defendants Darnold, Brown, and Chandler committed the tort of assault by intentionally putting plaintiffs in apprehension of an imminent battery. Plaintiffs also allege defendants committed a battery against Mr. Walsh because his arrest and frisk constituted an unwarranted and unlawful touching without his consent.

 An assault is an unlawful offer or attempt, coupled with a present ability, to inflict an injury upon the person of another. *Daniel v. Maxwell*, 176 Ohio St. 207, 208, 198 N.E.2d 657 (1964) (citing 5 Oh Jur (2d), Assault and Battery § 2).

 A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results. *Love v. City of Port Clinton*, 37 Ohio St.3d 98, 99, 524 N.E.2d 166 (1988) (citing Restatement (Second) of Torts § 13 (1965)). Contact which is offensive to a reasonable sense of personal dignity is offensive contact. *Id.*

Plaintiffs have provided no evidence as to how Darnold and Brown could be liable for these torts. Thus, Darnold and Brown's motion for summary judgment as to these claims is granted.

Chandler and Kish's motion for summary judgment on the assault and battery claim, however, is denied. There are facts in dispute as to whether Chandler and Kish arrested Mr. Walsh. An unlawful arrest would involve an unlawful touching. Also, placing Mr. Walsh on Darnold's automobile and frisking him are undoubtedly offensive to a reasonable sense of personal dignity.

Moreover, given the apparent complete lack of lawful authority—there was neither probable cause for an arrest nor a reasonable basis for believing Mr. Walsh was armed—a jury could find that Chandler's actions were reckless. Thus, Chandler is not entitled to immunity under state law for the assault and battery claim. Likewise, Kish is not entitled to immunity for the assault claim.

### D. Intentional Infliction of Emotional Distress

■ Plaintiffs allege defendants' actions were intentional and outrageous, thereby intentionally inflicting emotional distress on the plaintiffs.

■ Intentional infliction of emotional distress has four elements:

1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;

2) the conduct was so outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community,"

3) the actions were the proximate cause of plaintiff's psychic injury; and

4) the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it."

*Pyle v. Pyle* 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (1983).

Defendants argue their conduct does not rise to the level of extreme and outrageous to make them liable.

"Extreme and outrageous" conduct has been described as occurring in cases "in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Yeager v. Local Union 20, Teamsters Chauffeurs, Warehousemen & Helpers of America*, 6 Ohio St.3d 369, 375, 453 N.E.2d 666 (1983). A reasonable juror, being apprized of the pertinent Fourth Amendment legal doctrines, including the basic sanctity of the home and the right to be free from unjustified intrusion, and, as well, the constitutional protection otherwise given to the family, could view the threats of taking the children away, the arrest, ensuing entry into the home, and the searches of Mr. Walsh and the family home to have been outrageous.

Defendants also argue that plaintiffs have failed to meet their burden of showing that they suffered serious emotional distress.

■ "Serious emotional distress" is defined as "emotional injury which is both severe and debilitating." *Paugh v. Hanks*, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983). The definition goes beyond "trifling mental disturbance, mere upset or hurt feelings." *Id.* Serious emotional distress may be found "where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Id.* A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia. *Id.*

Plaintiffs allege that Linda Walsh has suffered severe emotional distress. Her affidavit states that when she is at home, she is overcome with fear, nervousness, and claustrophobia. She claims that, an uncontrollable fear of the police coming to take her children away has caused her to move to another county. Mr. Walsh has also testified that Mrs. Walsh has spells of anxiety and "panic attacks," causing her to move to another county.

Defendants argue plaintiffs' claim must fail because Mrs. Walsh has not received a medical diagnosis of physical or psychological injury. Ohio courts have concluded, however, that "[p]roof of serious emotional distress may be offered in the form of expert medical testimony, but expert opinion is not indispensable. Lay witnesses acquainted with the plaintiff may also testify to significant changes that they have observed in the emotional or habitual makeup of the plaintiff." *Uebelacker v.*

*Cincom Systems, Inc.*, 48 Ohio App.3d 268, 276, 549 N.E.2d 1210 (1988); *see also Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 6, 771 N.E.2d 874 (2002) (noting that "expert medical testimony is not indispensable to a claim of serious emotional distress").

In *Uebelacker*, the court found an issue of fact as to whether the plaintiff suffered serious emotional injury based on the affidavit of his wife of twenty-six years, who testified he "was highly emotional, moody, tearful, forgetful, distrusting of others, compulsive, uncommunicative and unsupportive." *Id.*

With the evidence construed in plaintiffs' favor, they have established that the emotional distress allegedly suffered by Mrs. Walsh is sufficiently severe and debilitating to support this claim. Because there is evidence of severe emotional injury, its seriousness is a question of fact for the jury.

Also, a jury could find defendants' actions malicious or reckless; defendants are therefore not entitled to immunity on this claim.

### Conspiracy

Plaintiffs also allege that defendants entered into a conspiracy, under federal and state law, to violate plaintiffs' state and federal constitutional, statutory, and common law rights.

Plaintiffs do not allege a federal basis for the conspiracy charge. The civil rights conspiracy statute, 42 U.S.C. § 1985(3), on which, presumably, plaintiffs base their federal conspiracy claim, provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws ....

■ Section 1985(3) requires that there be some racial or other class-based invidiously discriminatory animus behind the conspirators' action. *United Brotherhood of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). Plaintiffs have alleged the existence of a conspiracy, but their complaint does not claim that the alleged conspiracy had a racial or otherwise class-based, discriminatory animus.

Because plaintiffs do not provide another source for a federal conspiracy claim, defendants' motion for summary judgment is granted as to this claim.

■ Under Ohio law, the tort of civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Le Fort v. Century 21–Maitland Realty Co.,* 32 Ohio St.3d 121, 126, 512 N.E.2d 640 (1987). The ultimate fact of conspiracy is solely a question for the jury, unless the court can say, as a matter of law, that there is no proof tending to establish a conspiracy. *Liston v. Statler,* 9 Ohio App. 398, 401 (1917). An underlying unlawful act is required before a civil conspiracy claim can succeed. *Gosden v. Louis,* 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (1996). The malice involved in this tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Pickle v. Swinehart,* 170 Ohio St. 441, 443, 166 N.E.2d 227 (1960). Also, in a conspiracy, the acts of coconspirators are attributable to each other. *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 476, 700 N.E.2d 859 (1998).

Chief Kish stated in his deposition that charging Mr. Walsh with obstruction of official business was an alternative discussed with the caseworkers at the Vermilion police station. (Kish Dep. at 41) He

also stated that the caseworkers spoke to their supervisors and the prosecutors office. Kish then stated: "At some point it did come up where I know they were authorized to sign the charge for obstructing." (*Id.* at 42).

Plaintiffs argue this testimony is sufficient to establish that the police and caseworkers intentionally cooperated and conspired in a plan to detain the Walsh family unlawfully and to apply coercive pressure on Mr. Walsh to compel his consent to a warrantless search.

The record, however, does not support such a contention. A discussion between the police and caseworkers about possibly charging Mr. Walsh with obstruction of official business and authorizing the caseworkers to sign a complaint do not support a claim of unlawful conspiracy. There is, in any event, no evidence in the record that Darnold and Brown agreed to arrest Mr. Walsh as an alternative to obtaining a search warrant.

The defendants' motions for summary judgment on the conspiracy claims are granted.

### CONCLUSION

It is, therefore,

ORDERED THAT:

1. The County defendants' motion for summary judgment be, and the same hereby is, denied as to plaintiffs' § 1983 Fourth Amendment claims, the failure to train claim against ECDJFS, and the state law claims of false arrest/false imprisonment and intentional infliction of emotional distress; and

2. The County defendants' motion for summary judgment be, and the same hereby is, granted as to the remaining claims.

3. The City defendants' motion be, and the same hereby is, denied as to plaintiffs' § 1983 Fourth Amend-

ment claims and their state law claims of false arrest/false imprisonment, assault, battery, and intentional infliction of emotional distress; and

4. The City defendants' motion be, and the same hereby is, granted as to all claims against Rick Riggs, all claims against the City, and the remaining claims.

So ordered.